In re Cynthia CARDENAS, mother
and next friend of Isabelle
Perez, Plaintiff

v.

Vandna JERATH, M.D.; and St. Anthony
Hospital North., Defendants.

No. 07SA150.

Supreme Court of Colorado,
En Banc.

March 17, 2008.

Rehearing Denied April 7, 2008.*

---

* Justice COATS and Justice EID would grant the petition.

**417**

Leventhal, Brown, & Puga, P.C., Lorraine E. Parker, Leslie C. Stratton, Benjamin Sachs, Denver, Colorado, Attorneys for Plaintiffs.

Kennedy Childs & Fogg, P.C., John R. Mann, Chad K. Gillam, Denver, Colorado, Attorneys for Defendant St. Anthony Hospital North.

Kutak Rock LLP, Melvin B. Sabey, Denver, Colorado, Attorneys for Amicus Curiae Colorado Hospital Association.

Campbell, Latiolais & Ruebel, P.C., Jeffrey C. Ruebel, Denver, Colorado, Attorneys for Amicus Curiae Colorado Defense Lawyer's Association.

Martin Conklin, P.C., John L. Conklin, Amy K. Cardone, Denver, Colorado, Attorneys for Amicus Curiae Kaiser Foundation Health Plan of Colorado.

Office of University Counsel, Patrick T. O'Rourke, Special Assistant Attorney General, Denver, Colorado, Attorneys for Amicus Curiae Board of Regents of the University of Colorado.

Davis Graham & Stubbs LLP, Andrew M. Low, Richard P. Holme, Sara P. Bellamy, Denver, Colorado, Attorneys for Amici Curiae Vandna Jerath, M.D.; and Colorado Civil Justice League.

Starrs Mihm & Caschette LLP, Daniel A. Wartell, Michael T. Mihm, Anna Natividad Martinez, Denver, Colorado, Attorneys for Amicus Curiae American Civil Liberties Union of Colorado.

Holland & Hart LLP, Patricia Dean, Teresa D. Locke, Denver, Colorado, Attorneys for Amicus Curiae Colorado Citizens for Accountability.

McDermott, Hansen and McLaughlin, LLP, William J. Hansen, Denver, Colorado, Attorneys for Amicus Curiae Colorado Trial Lawyers Association.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

In this C.A.R. 21 original proceeding, we address two discovery issues arising in a medical malpractice lawsuit filed on behalf of Isabelle Perez, who was born at St. Anthony Hospital North with severe neurological injuries. First, we consider whether the work product doctrine shields from discovery investigation notes created by St. Anthony's attorney after Isabelle's birth. In this case, St. Anthony did not conduct a routine factual investigation of its own and the attorney's notes represent the only investigative report that exists of what happened before, during, and after Isabelle's birth. Second, we consider whether the trial court erred when it ordered Isabelle's mother, Cynthia Cardenas, to execute written waivers authorizing the release of her medical records directly to St. Anthony from all the health care providers that saw or treated her during the five years prior to Isabelle's birth, and to provide St. Anthony with a list of all the health care providers that Cardenas has seen since Isabelle's birth and the dates on which she saw them. As part of her initial disclosures, Cardenas disclosed her medical records from the pregnancies and births of Isabelle and Cardenas's other child.

The attorney's notes may contain unique factual information such as the contemporaneous sense impressions of a fact witness, taken nearly four years ago, regarding Isabelle's birth. Hence, we conclude, in this particular case, where St. Anthony neither prepared nor compiled any factual investigative documents of its own concerning what happened during the labor and delivery process, that Cardenas has demonstrated a substantial need for the attorney's notes and an inability to obtain the information contained in the notes by other means. We hold that the factual portions of the attorney's notes are not shielded from discovery by the work product doctrine. We emphasize that the work product doctrine continues to shield from discovery the mental impressions, conclusions, opinions, and legal theories contained in the attorney's notes. As such, St. Anthony must provide the trial court with a clean copy of the attorney's notes so that the trial court can conduct an in camera review of the notes to redact any mental impressions, conclusions, opinions, or legal theories. Then, the redacted notes may be discovered by Cardenas.

We also hold that the trial court abused its discretion by issuing such a broad order regarding Cardenas's medical records. We have examined this issue in the past and determined that waiver of the physician-patient privilege in a personal injury lawsuit is limited to the injuries and damages claimed by the patient. To ensure that discovery of Cardenas's medical records is limited to the scope of the issue of causation associated with Isabelle's claims for personal injury, we follow the procedure outlined in *Alcon v. Spicer*, 113 P.3d 735, 738–42 (Colo.2005), which requires Cardenas to provide St. Anthony with a privilege log that identifies the medical records she claims are protected from discovery by the physician-patient privilege both for the five years before Isabelle's birth and for the period of time since Isabelle's birth. The privilege log must describe each record with sufficient detail so that St. Anthony—and if necessary the trial court—can assess whether the contested medical record relates to the issue of causation concerning Isabelle's injuries, thereby waiving the privilege for that medical record.

Accordingly, we make the rule to show cause absolute. The trial court's order is vacated, and we return this case to that court for proceedings consistent with this opinion.

## II. Facts and Procedural Background

Isabelle Perez was born on May 27, 2004, with severe neurological injuries. Nearly two years after Isabelle's birth, her mother, Cynthia Cardenas, initiated this medical malpractice lawsuit on Isabelle's behalf, alleging claims for personal injury against St. Anthony Hospital North, the hospital at which Isabelle was born, and against Vandna Jerath, the obstetrician who delivered Isabelle by emergency Caesarean section. Later, the complaint was amended to add Cardenas as a plaintiff in her own right for claims for economic loss associated with Isabelle's injuries. Pursuant to C.A.R. 21, Cardenas petitioned this court for relief from the trial court's rulings that denied Cardenas's motion to compel the production of documents and information related to St. Anthony's factual investigation of Isabelle's birth, and that denied Cardenas's motion for a protective order concerning her medical records. In connection with its rulings, the trial court ordered Cardenas to execute written waivers authorizing the release of her medical records directly to St. Anthony from all the health care providers that saw or treated her during the five years prior to Isabelle's birth, and to provide St. Anthony with a list of all the health care providers that Cardenas has seen since Isabelle's birth and the dates on which she saw them.

Cardenas was admitted to St. Anthony at approximately 11:00 p.m. the night before Isabelle's birth. At that time, Cardenas was in labor and there were no signs of fetal distress. At approximately 12:15 a.m., however, the fetal heart rate began to drop. The nurses monitoring Cardenas called Jerath at approximately 1:22 a.m. to advise her that the fetal heart rate was dropping. Jerath arrived at St. Anthony at approximately 2:04 a.m. and immediately delivered Isabelle by Caesarean section. During the labor and delivery process, Isabelle suffered a respiratory arrest and was born with severe neurological injuries.

Soon after Isabelle's birth, Cardenas and Isabelle's father began asking the nursing staff and others at St. Anthony questions about the nature and cause of Isabelle's injuries. Cardenas stated, in her deposition, that she and Isabelle's father "raised a big issue with the timing" of the medical care provided at St. Anthony during the labor and delivery process.

The day after Isabelle's birth, St. Anthony's director of risk management contacted attorney Frank Kennedy. According to Kennedy's affidavit, he was retained by St. Anthony "to advise and represent the Hospital concerning the expected litigation." In his affidavit, Kennedy stated that he "immediately gave the Hospital both oral and written legal advice regarding preservation of records and other physical evidence." The same day that Kennedy was retained by St. Anthony, he wrote a letter to St. Anthony's director of risk management requesting the director's assistance "in preparing the Hospital's defense to litigation which we expect will be filed by [Cardenas]."

Nine days later, Kennedy interviewed Linda Wolford, a labor and delivery nurse at St. Anthony who provided care to Cardenas during the labor and delivery process. In his affidavit, Kennedy stated that he created notes of his interview with Wolford. Kennedy also stated that he created notes of his communications with St. Anthony's risk management personnel and of his review and evaluation of relevant medical records.

After initiating litigation against St. Anthony, Cardenas attempted to discover documents that she presumed St. Anthony prepared and compiled as part of a routine investigation of Isabelle's birth. In its response brief to Cardenas's motion to compel, St. Anthony stated that it advised Cardenas "on a number of occasions" that "[n]o documents were compiled as part of a routine hospital procedure." During the motions hearing before the trial court, Cardenas's counsel expressed disbelief that St. Anthony never conducted a routine factual investigation of Isabelle's birth:

> You know, this letter that was sent … says no documents were part of a "routine hospital procedure." Well, that doesn't mean that there weren't other documents created. I mean, it's hard to believe that the risk manager does not have a single— the hospital doesn't have a single document about their investigation of this case, that just defies common sense.

However, in its briefs to the trial court, at the motions hearing before the trial court, and during oral argument before this court, St. Anthony stated that it neither created nor maintained a risk management file or any type of hospital incident report concerning the labor and delivery process of Isabelle.

When pressed during oral argument before this court, St. Anthony's counsel expressly confirmed what it had previously only implied: that Kennedy's notes represent the only investigative report that exists of what happened before, during, and after Isabelle's birth. Thus, Cardenas has been attempting to discover investigative documents that simply do not exist.

As part of her initial disclosures, Cardenas authorized St. Anthony to access the medical records associated with the pregnancies and births of Isabelle and Cardenas's other child, who was born on July 26, 2000, also at St. Anthony. St. Anthony then requested the production of a list of all the health care providers that saw or treated Cardenas in the last ten years, as well as every mental health care provider or facility that has ever provided services to Cardenas. St. Anthony further requested that Cardenas authorize St. Anthony to obtain Cardenas's medical records directly from each of these health care providers and mental health care providers or facilities.

Thereafter, Cardenas filed a motion to compel the production of documents and information related to the factual investigation of Isabelle's birth, including Kennedy's notes, information from Wolford concerning her interview with Kennedy, and any other relevant documents. Cardenas also filed a motion for a protective order concerning her medical records.

The trial court denied Cardenas's motion to compel. It found that the concerns raised by Cardenas and Isabelle's father, combined with the overall factual circumstances of the situation, suggested to St. Anthony that litigation was likely to occur. Based on this finding, the trial court determined that any documents and information related to the factual investigation of Isabelle's birth were prepared in anticipation of litigation, constitute work product, and are, therefore, shielded from discovery by the work product doctrine.

The trial court also denied Cardenas's motion for a protective order concerning Cardenas's medical records. Balancing Cardenas's right to privacy and St. Anthony's right to discovery, the trial court determined that St. Anthony is entitled to discover some, but not all, of the medical records it requested. The trial court ordered Cardenas to execute written waivers authorizing the release of her medical records directly to St. Anthony from all the health care providers that saw or treated Cardenas during the five years prior to Isabelle's birth. The trial court also ordered Cardenas to provide St. Anthony with a list of all the health care providers that

Cardenas has seen since Isabelle's birth and the dates on which she saw them.

Cardenas petitioned this court for relief from the trial court's order. First, she argues that the work product doctrine does not shield Kennedy's notes from discovery because St. Anthony retained Kennedy for the sole purpose of disguising a routine factual investigation as work product. Second, Cardenas contends that any medical records not associated with the pregnancies and births of her two children are protected from discovery by the physician-patient privilege because they are irrelevant to her claims for economic loss associated with Isabelle's injuries. In the alternative, Cardenas claims that instead of being required to authorize the release of her medical records directly to St. Anthony from her health care providers, she should be permitted to provide St. Anthony with a privilege log of the medical records she claims remain privileged. We issued a rule to show cause as to why the trial court's order should not be reversed.

### III. Original Jurisdiction

■ Because discovery orders are interlocutory in character, they generally are not reviewable in a C.A.R. 21 original proceeding. *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Ct.*, 718 P.2d 1044, 1046 (Colo.1986). However, a discovery order is "not exempted from extraordinary relief under appropriate circumstances." *Morgan v. Genesee Co.*, 86 P.3d 388, 391 (Colo.2004) (quoting *Sanchez v. Dist. Ct.*, 624 P.2d 1314, 1316–17 (Colo.1981)).

■ C.A.R. 21 authorizes us to exercise our original jurisdiction to review whether a trial court abused its discretion if a remedy on appeal would be inadequate. *Id.* at 391. In a prior case, we determined that we may exercise our original jurisdiction to review a discovery order if it appears that the order "may cause unwarranted damage to a litigant that cannot be cured on appeal." *Direct Sales Tire Co. v. Dist. Ct.*, 686 P.2d 1316, 1318 (Colo.1984). In another prior case, we held that we may exercise our original jurisdiction to review a discovery order "when the petitioner alleges the applicability of a privilege that may shield disclosure of the requested information." *Hartmann v. Nordin*,

147 P.3d 43, 48 (Colo.2006). We have also previously determined that we will exercise our original jurisdiction "when a pretrial order departs significantly from the standards prescribed by the rules of civil procedure and places a party at an unwarranted disadvantage in litigating the merits of his [or her] case." *Hawkins v. Dist. Ct.*, 638 P.2d 1372, 1375 (Colo.1982) (exercising original jurisdiction on grounds that the trial court's order "preclude[d] the petitioner from obtaining information vital to his claims for relief").

■ We follow these legal standards and conclude that it is appropriate for us to exercise our original jurisdiction to review the trial court's order in this case. First, the trial court's ruling that denied Cardenas's motion to compel prevents Cardenas from obtaining factual information that is vital to her claims for relief. Second, both Cardenas and St. Anthony allege the applicability of a privilege to protect documents and information from discovery. St. Anthony argues that the work product doctrine shields from discovery information related to Kennedy's investigation of Isabelle's birth, while Cardenas contends that the physician-patient privilege protects her medical records from discovery. Third, the trial court's order departs significantly from our precedent regarding the procedure for discovery of medical records and the waiver of the physician-patient privilege. By ordering Cardenas to execute written waivers authorizing the release of her medical records directly to St. Anthony, the trial court has provided St. Anthony with unbridled access to medical records that may be privileged.

### IV. Analysis

■ As an initial matter, we note that the rules of discovery are outlined in C.R.C.P. 26, which is patterned after its federal counterpart. *Cameron v. Dist. Ct.*, 193 Colo. 286, 289, 565 P.2d 925, 928 (1977). C.R.C.P. 26 serves to eliminate surprise at trial, to enable discovery of relevant evidence, to simplify the issues, and to promote expeditious settlement of cases. *Id.* Consistent with these purposes, the range of discovery available to each party is wide. *Id.* at 290, 565 P.2d at 928. The rules of discovery authorize the

parties to "obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." C.R.C.P. 26(b)(1).

 We review a trial court's discovery rulings for abuse of discretion. *Hartmann,* 147 P.3d at 49; *Gordon v. Boyles,* 99 P.3d 75, 82 (Colo.App.2004) (reviewing a discovery order to determine whether the trial court properly determined applicability of a newsperson's privilege to protect his sources of information). "We will find an abuse of discretion only if the ruling was manifestly arbitrary, unfair, or unreasonable." *Gordon,* 99 P.3d at 82.

## A. St. Anthony Must Produce the Factual Portions of the Notes Created by Its Attorney During the Attorney's Investigation of Isabelle's Birth

The work product doctrine provides that materials "prepared in anticipation of litigation or for trial" are discoverable "only upon a showing that the party seeking discovery has substantial need of the materials ... and is unable without undue hardship to obtain the substantial equivalent of the materials by other means." C.R.C.P. 26(b)(3). However, the doctrine further provides that certain materials, even if they are prepared in anticipation of litigation or for trial, may never be discovered: "[T]he court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Id.*

 The purpose of the work product doctrine is to give "qualified immunity from discovery" to materials prepared in anticipation of litigation or for trial. *Hawkins,* 638 P.2d at 1376. As such, the work product doctrine does not shield from discovery materials prepared in the ordinary course of business. *Id.* at 1377. In *Hawkins,* we recognized that "there is no bright line which will mark the division between these two types of activities in all cases." *Id.* at 1378. There, we explained that the "general standard to be applied is whether, in light of the nature of the document and the factual situation in the particular case, the party resisting discovery demonstrates that the document was pre-

pared or obtained in contemplation of specific litigation." *Id.* at 1379.

In *Hawkins,* we examined whether the work product doctrine shields an insurance adjuster's investigative reports, including witness statements, from discovery in a lawsuit brought by an insured against his insurance company. *Id.* at 1375. There, we determined that because "a substantial part of an insurance company's business is to investigate claims," an adjuster's investigations "must be presumed" to be part of the insurance company's ordinary business activity. *Id.* at 1378.

Shortly after *Hawkins* was decided, we extended its rationale to a case involving a hospital's incident report. *Kay Labs., Inc. v. Dist. Ct.,* 653 P.2d 721, 721–23 (Colo.1982). In *Kay Laboratories,* the incident report was a pre-printed form to be completed in triplicate whenever an incident occurred that "could possibly result in litigation against the hospital." *Id.* at 722. There, we treated the self-insured hospital as if it were an insurance company and concluded that such reports were presumed to be part of the hospital's ordinary business activity. *See id.* at 722–23.

In a subsequent case, we relied on *Hawkins* to determine whether a memorandum prepared by an insurance company's attorneys regarding an insurance claim was protected under the work product doctrine. *Nat'l Farmers Union,* 718 P.2d at 1047–48. There, we concluded that the attorneys' memorandum was not shielded from discovery because the "attorneys were performing the same function a claims adjuster would perform, and the resulting report is an ordinary business record of the insurance company." *Id.* at 1048.

Cardenas argues that information related to Kennedy's investigation is not shielded from discovery by the work product doctrine because St. Anthony retained Kennedy not in contemplation of specific litigation, but rather for the sole purpose of disguising a routine factual investigation as work product. In support of her position, Cardenas asserts that because St. Anthony is self-insured, Kennedy's investigation of Isabelle's birth

should be treated like the incident report in *Kay Laboratories*. In contrast, St. Anthony argues that it should not be treated as a self-insured hospital because there was no evidence presented to the trial court that St. Anthony is self-insured.[1]

If St. Anthony is self-insured, then the holding in *Kay Laboratories* would control this case and we would presume that Kennedy's investigation of Isabelle's birth was conducted in the ordinary course of business. However, because this fact was not established before the trial court, we will, for the purposes of this opinion, assume that Kennedy's investigation was conducted in anticipation of litigation and not in the ordinary course of business.

■ Thus, we turn to the question of substantial need and undue hardship. We focus on the undisputed facts that St. Anthony did not conduct a routine factual investigation of Isabelle's birth and that Kennedy's notes represent the only investigative report that exists of what happened before, during, and after Isabelle's birth. We do so because we retain the authority to make legal determinations based on undisputed facts. *See Gross v. Appelgren*, 171 Colo. 7, 16–17, 467 P.2d 789, 793 (1970) ("Where the trial court has made no finding one way or the other on a particular question, this court may determine pure questions of law when it is warranted and supported by a record which could produce no other result.").

As mentioned above, the work product doctrine provides that materials "prepared in anticipation of litigation or for trial" are discoverable "only upon a showing that the party seeking discovery has substantial need of the materials ... and is unable without undue hardship to obtain the substantial equivalent of the materials by other means." C.R.C.P. 26(b)(3). "In determining whether the requesting party has met the substantial need/undue burden test, attention is directed at alternative means of acquiring the information that are less intrusive to the attorney's work, and whether the information can be furnished in other ways." 6 James Wm. Moore et al., *Moore's Federal Practice* § 26.70[5][b] (3d ed.2007).

■ A party requesting the production of material protected by the work product doctrine demonstrates substantial need by establishing that the material requested contains critical factual information necessary to prove the party's case. *See Watson v. Reg'l Transp. Dist.*, 762 P.2d 133, 142 (Colo.1988) (determining that there was substantial need for a videotape of a bus negotiating a turn because a "critical factual issue at trial was whether the bus was capable of negotiating the turn without striking a vehicle stopped for a red light on the street into which the bus was turning"); *see also* Moore et al., *supra*, § 26.70[5][c] ("Substantial need for material otherwise protected by the work product doctrine is demonstrated by establishing that the facts contained in the requested documents are essential elements of the requesting party's prima facie case.").

■ A party is unable without undue hardship to obtain the substantial equivalent of the materials by other means when the requested materials are not available by any other source. *See Watson*, 762 P.2d at 142 (determining that there was undue hardship to obtain substantial equivalent of a videotape of a bus negotiating a turn because the plaintiff could not reproduce the turn as it was depicted on the videotape); *see also* 10 *Federal Procedure, Lawyers Edition* § 26:211 (Francis M. Dougherty et al., eds., 2007) ("A party is entitled to discovery of attorney work-product only if he or she demonstrates that the requested information was not available by any other source.").

It is particularly difficult for a party to obtain the substantial equivalent of statements taken from witnesses at about the time of the incident because these statements "are unique, in that they provide an immediate impression of the facts." 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2025

---

1. As part of its initial disclosures, St. Anthony stated that it is insured by Catholic Health Initiatives. Cardenas presented evidence on appeal to this court that Catholic Health Initiatives is a form of self-insurance. This evidence—an October 2, 2004, letter to the Colorado Division of Insurance—was not presented to the trial court.

(2d ed.2007); *see also* Moore et al., *supra,* § 26.70[5][c]. For this reason, the production of witness statements is often justified by mere lapse of time. Moore et al., *supra,* § 26.70[5][c] ("A lapse of time itself may make it impossible to obtain a substantial equivalent of the material.").

Here, factual information concerning the medical care provided by St. Anthony and Jerath is essential to prove Cardenas's case. Because St. Anthony did not conduct a routine factual investigation of Isabelle's birth, Kennedy's investigation was the only factual investigation conducted and, consequently, his notes represent the only investigative report that exists of what happened before, during, and after Isabelle's birth. It is unclear whether Kennedy's notes contain a formal witness statement from Wolford or whether the notes merely record the factual portions of Kennedy's interview with her. Irrespective of their form, Wolford's contemporaneous sense impressions of the labor and delivery process, as collected in Kennedy's notes, constitute unique factual information, the substantial equivalent of which cannot be obtained by Cardenas either through a deposition of Wolford or through additional discovery. It has been nearly four years since Isabelle's birth, a significant lapse of time suggesting that Wolford's impressions of the labor and delivery process today may differ from the contemporaneous sense impressions that she provided to Kennedy shortly after Isabelle's birth. Additional discovery in this case is impossible because of St. Anthony's failure to conduct a routine factual investigation of Isabelle's birth.[2] Under these circumstances, we conclude that Cardenas has demonstrated a substantial need for factual information concerning the medical care provided by St. Anthony and Jerath during the labor and delivery process, which is necessary to prove Cardenas's case and which she is unable to obtain by any means other than through the discovery of Kennedy's notes.

2. We note that St. Anthony has stated that Wolford is the only fact witness who was interviewed by Kennedy. However, St. Anthony represented to the trial court that Kennedy interviewed not a nurse, but rather that he interviewed "nurses." During oral argument, St. Anthony's counsel suggested that the "s" was a typographical error in the document presented to the trial court. If Kennedy interviewed additional fact witnesses during his investigation, then Cardenas may also discover the factual portions of Kennedy's interviews with these witnesses and any formal witness statements made by these witnesses.

As is the situation here, when a showing is made that entitles a party to materials prepared in anticipation of litigation, the court must "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." C.R.C.P. 26(b)(3).

Hence, we hold that the work product doctrine does not shield from discovery the factual information contained in Kennedy's notes regarding his investigation of Isabelle's birth. To ensure that only factual portions of the notes are disclosed, St. Anthony must provide the trial court with an unredacted copy of Kennedy's notes so that the trial court can conduct an in camera review of the notes to redact any mental impressions, conclusions, opinions, or legal theories. Cardenas will then be entitled to discover Kennedy's redacted notes.

## B. Cardenas Must Provide a Privilege Log That Identifies the Medical Records She Claims Are Protected from Discovery by the Physician–Patient Privilege

We turn now to the trial court's ruling regarding the discoverability of Cardenas's medical records.

Colorado's physician-patient privilege prevents a physician, surgeon, or registered nurse from being examined as a witness as to any information acquired in and necessary to treating a patient without the consent of the patient. § 13–90–107(1)(d), C.R.S. (2007). The statute mandates:

[A] physician, surgeon, or registered professional nurse duly authorized to practice his [or her] profession pursuant to the laws of this state or any other state shall not be examined without the consent of his [or her] patient as to any information acquired in attending the patient which was neces-

sary to enable him to prescribe or act for the patient.

*Id.*

▮ This privilege applies equally to pretrial discovery as it does to in-court testimony. *Weil v. Dillon Cos., Inc.,* 109 P.3d 127, 129 (Colo.2005) (quoting *Hoffman v. Brookfield Republic, Inc.,* 87 P.3d 858, 861 (Colo. 2004)). Thus, the physician-patient privilege protects certain information from discovery even if the information is relevant to the subject matter of the case and would be discoverable otherwise. *See Alcon,* 113 P.3d at 738.

▮ As the statute explains, the purpose of the privilege is "to encourage confidence and to preserve it inviolate." § 13–90–107(1). The physician-patient privilege is designed to protect the patient, and the patient may waive such protections, thereby consenting to disclosure. *See, e.g., Alcon,* 113 P.3d at 739. One way a party waives the physician-patient privilege is by injecting his or her "physical or mental condition into the case as the basis of a claim or an affirmative defense." *Clark v. Dist. Ct.,* 668 P.2d 3, 10 (Colo.1983). This waiver does not amount to a general disclosure of the patient's entire medical history, but rather is limited to the cause and extent of the injuries and damages claimed. *See, e.g., Alcon,* 113 P.3d at 740.

▮ Cardenas argues that her medical records, other than those that are associated with the pregnancies and births of her two children, are protected from discovery by the physician-patient privilege because they are irrelevant to her claims for economic loss associated with Isabelle's injuries. St. Anthony disagrees and argues that Cardenas's medical history is relevant to her claims for relief because Cardenas's health before, during, and after the pregnancy may prove that Isabelle's injuries were caused by something other than St. Anthony's negligence.

More than seventy years ago, we acknowledged that the "physical and mental conditions surrounding the expectant mother are vital factors in the unfolding life of the child itself." *Metzger v. People,* 98 Colo. 133, 137, 53 P.2d 1189, 1191 (1936). More recently, we recognized that evidence of family medical history may be relevant to the defense of a medical malpractice lawsuit because it may show that something other than the defendant's negligence caused the injuries claimed. *Hartmann,* 147 P.3d at 51. In *Hartmann,* we determined that a patient, who sued her health care providers alleging that they failed to diagnose a condition that resulted in a stroke, placed the cause of the stroke at issue and, thus, also placed her relevant family medical history at issue. *Id.* at 51–53.

The causal relationship between the health of a mother and the health of her child is akin to family medical history. Following the holding in *Hartmann,* we conclude that although Cardenas's claims for economic loss associated with Isabelle's injuries do not constitute an implied waiver of the physician-patient privilege, Isabelle's claims for personal injury, which involve the issue of causation, do constitute an implied limited waiver. To ensure that discovery of Cardenas's medical records is limited to the scope of the issue of causation associated with Isabelle's claims for personal injury, we confine discovery to Cardenas's medical records for the five years before Isabelle's birth and for the period of time since Isabelle's birth, to the extent that the records are relevant to the cause of Isabelle's injuries.

We have previously set forth the procedure for ensuring that discovery of medical records is limited to the scope of the waiver of the physician-patient privilege in accordance with Colorado's rules of discovery. *Alcon,* 113 P.3d at 741–42 (interpreting C.R.C.P. 26(b)(5) ). There, we held that a party asserting the physician-patient privilege must provide the party seeking the medical records with a privilege log identifying each of the medical records for which the privilege is claimed. *Id.* at 742. We further determined the party asserting the privilege must describe each medical record with sufficient detail so that the applicability of the physician-patient privilege can be assessed by the party seeking the medical records and, if necessary, by the trial court. *Id.*

▮ Here, the trial court ordered Cardenas to execute written waivers authorizing the release of her medical records directly to

St. Anthony from all the health care providers that saw or treated her during the five years prior to Isabelle's birth, and to provide St. Anthony with a list of all the health care providers that Cardenas has seen since Isabelle's birth and the dates on which she saw them, even though Cardenas had already disclosed the medical records from the pregnancies and births of Isabelle and Cardenas's other child.

We conclude that the trial court abused its discretion by issuing such a broad order regarding Cardenas's medical records. Guided by the legal standards set forth in *Alcon,* we hold that Cardenas must provide St. Anthony with a privilege log that identifies the medical records she claims are protected from discovery by the physician-patient privilege both for the five years before Isabelle's birth and for the period of time since Isabelle's birth. The privilege log must describe each record with sufficient detail so that St. Anthony—and if necessary the trial court—can assess whether the contested medical record relates to the issue of causation concerning Isabelle's injuries, thereby waiving the privilege for that medical record. If the parties disagree about whether the physician-patient privilege protects a particular medical record, then the medical record must be submitted to the trial court for an in camera review. The trial court will then determine whether the medical record or portions of it are privileged, if at all. After review, the trial court will permit St. Anthony to discover non-privileged material.

## V. Conclusion

For the reasons stated above, we make the rule to show cause absolute and vacate the trial court's order. We return this case to the trial court for proceedings consistent with this opinion.

Justice COATS concurs in part and dissents in part, and Justice EID joins in the concurrence and dissent.

Justice COATS, concurring in part and dissenting in part.

Because I cannot agree that the plaintiff has demonstrated the substantial need and undue hardship required for even limited discovery of documents prepared in anticipation of litigation, I respectfully dissent from that portion of the majority opinion ordering disclosure of a redacted copy of Kennedy's interview notes.

The majority rightly concedes (on the one hand) that the applicability of the *Hawkins*[1] presumption for insurance investigations has not been demonstrated in this case, and therefore Kennedy's investigation on behalf of the defendant-hospital must be treated as work product. It then, however, prematurely orders (on the other) disclosure of the factual portions of Kennedy's notes anyway, finding the exception of C.R.C.P. 26(b)(3) for circumstances involving substantial need to have been demonstrated. Because the district court concluded that Kennedy's notes were not work product at all, the latter question was never before it, and the record required to support the exception's prerequisites of need and hardship has never yet been developed.

The majority's order mandating disclosure of the factual content of Nurse Wolford's statement can only be understood as a broad pronouncement that witness statements taken contemporaneously (or nearly contemporaneously) with an occurrence are necessarily more probative than any subsequent testimony of the same occurrence. Without ever considering the availability of other witnesses to the critical events or the ability of any available witnesses to adequately recall details of the event, the majority moves directly to the conclusion that the absence of any other contemporaneously-recorded witness statements is sufficient, in and of itself, to demonstrate the plaintiff's requisite need and hardship. While contemporaneous observations or recollections collected closer in time to the actual events might, under some circumstances, provide insights that cannot be duplicated by later investigation, the majority's broad mandate to share the content of investigative interviews with opposing parties who, for whatever reason, have failed to similarly investigate on their own lacks support

---

1. *Hawkins v. Dist. Ct.,* 638 P.2d 1372, 1373 (Colo.1982).

in either logic, policy, or the authorities upon which it relies.

It is widely accepted that the contemporaneous recollections of witnesses or documentation such as contemporaneous photographs and unique tests that cannot be reproduced by the party requesting the evidence may provide grounds for overcoming the protection of the work product doctrine. *See, e.g., McDougall v. Dunn,* 468 F.2d 468, 474 (4th Cir.1972) (noting that contemporaneous statements of witnesses or parties are "unique catalysts in the search for truth" and that there may, in some cases, be substantial need to disclose such statement even if protected by the work-product doctrine); *Rexford v. Olczak,* 176 F.R.D. 90, 93 (S.D.N.Y. 1997) (finding that the plaintiff's diary documenting her attempts to obtain employment must be produced notwithstanding the fact it was prepared in anticipation of litigation); *Reedy v. Lull Eng'g Co.,* 137 F.R.D. 405, 407–408 (M.D.Fla.1991) (finding plaintiff was entitled to photographs of the accident scene). Virtually all of the cases from which the majority's encyclopedic proposition is distilled, however, explain their holdings in terms of the specific reasons why comparable evidence was not otherwise reasonably available to the party seeking disclosure. *See McDougall,* 468 F.2d at 474 (stating that the plaintiff, who suffered amnesia as a result of the accident, could discover the evidence because he "was disabled from making his own investigation at the time"); *Rexford,* 176 F.R.D. at 93 (finding that defendants "demonstrated substantial need based on plaintiff's contradictory or unresponsive answers to deposition questions and interrogatories about the details of the events she recorded in her journal"); *Reedy,* 137 F.R.D. at 407–408 (finding that photographs and other documentation of the accident scene must be produced because the physical conditions of the scene had changed and the substantial equivalent of the photographs could not be obtained through depositions or other evidence). Even the secondary sources upon which the majority relies do not support the absolute rule its holding suggests and instead carefully hedge against an absolute rule. *See, e.g.,* 8 Charles A. Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and Procedure* § 2025 at 385–86, 389 (2d ed.1994) (noting that there is contrary authority to the proposition that "mere lapse of time" establishes substantial need for contemporaneous statements); 6 James Wm. Moore, et al., *Moore's Federal Practice* § 26.70[5][c] at 26–222.6 (3d ed.2007) (citing *Rexford* as authority that substantial need for contemporaneous statements "often exists" and that the lapse of time "may" make the substantial equivalent unavailable).

The only primary source relied upon by the majority typifies this case-specific approach to the determination of uniqueness and inability to reasonably acquire substantially equivalent evidence. In *Watson v. Regional Transportation District,* 762 P.2d 133 (Colo.1988), this court found that the plaintiff in a personal injury suit against RTD could not obtain the substantial equivalent of a videotape made by RTD, showing the capacity of its bus to negotiate a turn at the scene of the accident, because RTD controlled the bus in question and refused to permit the plaintiff to conduct his own experiment without using RTD's driver. Unlike *Watson,* there is no suggestion that the plaintiff in this case has been hampered in her ability to depose witnesses and conduct an investigation of her own or, for that matter, that further depositions and investigation would be incapable for some reason of producing the substantial equivalent of Nurse Wolford's initial statement. *See EEOC v. Lutheran Soc. Servs.,* 186 F.3d 959, 970 (D.C.Cir.1999) (concluding that disclosure of work-product is not required when the same factual information can be acquired by conducting interviews or depositions). The assumption that depositions or interviews will produce all factual information known by a particular witness holds true absent some evidence that the witness cannot recall the events or that there is some grave inconsistency between the witness's contemporaneous statements and his later deposition. *Gargano v. Metro-North,* 222 F.R.D. 38, 40 (D.Conn.2004).

Because I consider it essential to remand for development of a record and consideration by the district court of any reasons why the plaintiff has been or might yet be unable

to obtain comparable evidence, I respectfully dissent.

I am authorized to state that Justice EID joins in this concurrence and dissent.