B.B., Petitioner,

v.

The **PEOPLE** of the State of Colorado, Respondent.

In the Interest of **T.S.B.**, a Child.

No. 88SC332.

Supreme Court of Colorado, En Banc.

Jan. 16, 1990.

John M. Cross, Fort Collins, for petitioner.

Harden, Schmidt, Hass & Zier, P.C., Richard M. Stillwell, Asst. Co. Atty., Fort Collins, for respondent.

Justice LOHR delivered the Opinion of the Court.

This case involves the termination of the parent-child legal relationship between a mother, B.B., and her young child T.S.B. under the Parent–Child Legal Relationship Termination Act of 1977, §§ 19–11–101 to –110, 8B C.R.S. (1986).[1] The question presented is whether a privilege exists between an indigent parent and an expert witness appointed by the court at the request of the parent under section 19–11–107(1), enabling the parent to prevent the expert from testifying on behalf of the People at the termination hearing. The Larimer County District Court permitted such an expert to testify over B.B.'s objection and ultimately entered a judgment terminating the legal relationship between B.B. and her child T.S.B. On appeal, the Colorado Court of Appeals affirmed. *People in Interest of T.S.B.*, 757 P.2d 1112 (Colo.App.1988). We granted certiorari and now hold that an attorney-client privilege exists between a parent and an expert witness appointed for the parent at the request of the parent's attorney under section 19–11–107(1). Although there is some question whether the privilege was effectively asserted in this case, we conclude that the admission of the expert's testimo-

1. The Colorado Children's Code, Title 19, 8B C.R.S. (1986), of which the Parent–Child Legal Relationship Termination Act of 1977 is a part, was repealed and reenacted in 1987. See Ch. 138, secs. 1 to 49, §§ 19–1–101 to –11–110, 1987 Colo.Sess.Laws 695–823. In reenacting the Code, the general assembly reorganized and re- numbered the constituent statutory sections. For the purpose of this opinion, we employ the numbering system in effect when the relevant events in this case took place, all of which preceded the 1987 recodification of the Children's Code.

ny was harmless. We therefore affirm the judgment of the court of appeals.

## I.

B.B. is the mother of two minor children, six-year-old T.B. and four-year-old T.S.B. This certiorari review proceeding concerns the younger child, T.S.B., only. In November 1983, B.B. and T.B. moved to Larimer County, Colorado, from Garden City, Kansas, to be with the child's father, M.D.R. B.B. and M.D.R. separated a short while later.

Soon after B.B. and T.B. arrived in Colorado, the Larimer County Department of Social Services (department) received complaints concerning the care B.B. was providing for her child. The complaints alleged that B.B. left T.B. unattended, inappropriately dressed and unclean, and fed T.B. candy for meals. In accordance with statutorily-prescribed procedures, the department obtained temporary custody of T.B., placed him in foster care, and commenced dependency or neglect proceedings in Larimer County District Court. In March 1985, the Larimer County District Court entered a judgment determining that T.B. was a dependent or neglected child. A treatment plan to remedy the deficiencies in T.B.'s care was formulated in April 1985 and was adopted at that time by the court.

Meanwhile, B.B. gave birth to another child, T.S.B., on January 29, 1985. In May of that year, B.B. was arrested and jailed on felony theft charges. The department then initiated dependency or neglect proceedings in Larimer County District Court, obtained temporary custody of T.S.B., and placed the child in foster care. On October 16, 1985, T.S.B. was adjudicated to be a dependent or neglected child. A treatment plan concerning T.S.B. was developed and was approved by the court.

On June 6, 1986, the People filed motions in the dependency or neglect cases, seeking termination of the parent-child legal relationships between each of the parents, B.B. and M.D.R., and their children, T.B. and T.S.B. The motions alleged, among other things, that the parents had failed to comply with the terms of the treatment plans, that they were unfit, and that their conduct or condition was unlikely to change within a reasonable time. See § 19–11–105(1). On June 11, B.B., who was indigent, filed a motion through her attorney for the appointment of Dr. Peter Kaplan, a clinical psychologist, as an expert witness in the case concerning T.S.B. pursuant to section 19–11–107(1), 8B C.R.S. (1986). The court granted the motion.[2] A joint hearing on the termination motions in the two cases was held on September 16, 1986. The People called Dr. Kaplan as a witness in their case in chief, and B.B. objected. B.B. asserted that a psychologist-client privilege existed between her and the doctor, and that as a result Dr. Kaplan could not testify without her consent. The trial court permitted Dr. Kaplan to testify, concluding that no privilege had attached and, even if it had, the privilege had been eliminated "with respect to this type of case."[3]

Dr. Kaplan testified that he met with B.B. for one and one-half hours of interviews and three hours of testing for the purpose of performing a "disability evaluation" under a contract with the department

2. The partial record on appeal does not disclose whether Dr. Kaplan was also appointed as an expert witness in the case concerning T.B., but Kaplan's testimony suggests that he was.

3. The argument of counsel that preceded the ruling suggests that the court based its conclusion that the privilege had been eliminated upon the People's argument that any privilege that might exist was not a ground for exclusion of evidence because of § 19–10–112, 8B C.R.S. (1986), which provided:

The privileged communication between patient and physician, between patient and registered professional nurse, and between husband and wife shall not be a ground for excluding evidence in any judicial proceeding resulting from a report pursuant to [article 10 of chapter 19, 8B C.R.S. (1986), entitled "Child Abuse or Neglect"].

§ 19–10–112 has been repealed and reenacted and now appears at § 19–3–311, 8B C.R.S. (1989 Supp.). This basis of the trial court's ruling was not addressed by the court of appeals. Our grant of certiorari did not include this issue and, particularly because we find the trial court's judgment supported on other grounds, we do not address the applicability of § 19–10–112.

before the court appointed him as an expert witness under section 19–11–107(1). After his appointment, Kaplan met with B.B. for another one and one-half hours and on another occasion visited her at home for an hour. During the three hours spent with B.B. devoted to testing, Dr. Kaplan administered a Wechsler Adult Intelligence Scale, Wechsler Memory Scale, Minnesota Multiphasic Personality Inventory and a sentence completion test. Based on the results of those tests and his interviews and home visit with B.B., Dr. Kaplan found that B.B. had an I.Q. in the low normal range and was "impulsive, angry, confused, introverted, socially withdrawn, and guarded. In addition, there were indications that she ha[d] a potential to abuse alcohol and drugs."

Dr. Kaplan expressed the opinion that B.B. would present a poor role model for the children and, with her low cognitive abilities, would be unable properly to develop and carry out an adequate plan for raising her children and would have difficulty differentiating their needs from hers. Dr. Kaplan added that, although therapy and treatment might bring some improvement, significant change in B.B.'s ability to serve as a parent would require at least three years of treatment. The People concluded their direct examination by eliciting Dr. Kaplan's opinion that termination of B.B.'s parental rights would be beneficial to the children.

The People called several other expert witnesses to testify concerning their evaluations of B.B. and M.D.R. Their opinions of B.B.'s ability to serve as a parent were uniformly negative. Each expressed the opinion that termination of the parent-child legal relationships between the parents, B.B. and M.D.R., and their children, T.B. and T.S.B., would be in the best interests of the children.

On October 16, 1986, the trial court entered a written order terminating the parent-child legal relationships between B.B. and M.D.R. and their two children, T.B. and T.S.B. The order included findings of fact and stated that the facts constituted clear and convincing evidence meeting the statutory criteria for termination set forth in section 19–11–105.[4]

B.B. appealed the decision to the Colorado Court of Appeals. Her appeal, which concerned only T.S.B., raised three issues: (1) whether the trial court erred in admitting Dr. Kaplan's testimony over B.B.'s assertion of a psychologist-client privilege; (2) whether the trial court erred in finding the treatment plan appropriate; and (3) whether B.B. had been given a reasonable amount of time in which to comply with the treatment plan. The court of appeals affirmed the trial court's decision on all three issues.

B.B.'s petition for certiorari raised only the first issue. B.B. urges us to reverse the court of appeals' decision that by requesting appointment of Dr. Kaplan as an expert witness pursuant to section 19–11–107(1), she tacitly waived any psychologist-client privilege that may have arisen as a result of Dr. Kaplan's appointment. *People in the Interest of T.S.B.*, 757 P.2d 1112, 1113 (Colo.App.1988).[5] We analyze the

**4.** We do not detail these findings of fact and conclusions of law because their sufficiency is not at issue.

**5.** The court of appeals implicitly concluded that an expert witness appointed under § 19–11–107(1) will necessarily produce an "ordered evaluation" within the meaning of § 19–11–107(2), which provides: "All ordered evaluations shall be made available to counsel at least fifteen days prior to the hearing." It held that such an evaluation must be disclosed to all counsel under § 19–11–107(2) and that by taking advantage of the procedure available under § 19–11–107(1), a parent submits to the disclosure of the evaluation to all parties, thereby waiving any psychologist-client privilege that may have attached. *T.S.B.*, 757 P.2d at 1113. We are not persuaded that the information and opinion developed by an expert appointed under subsection (1) of § 19–11–107 will always produce an "ordered evaluation" under subsection (2). Subsection (2) extends not only to any "evaluation" that might be "ordered" under subsection (1) but also to other evaluations "ordered" by the court. *See A.M.D.*, 648 P.2d at 641 ("written reports and other material relating to a child's mental, physical, and social history" made pursuant to § 19–1–108 are "ordered evaluations" subject to the provisions of § 19–11–107(2)). In any event, we do not rest our analysis upon the ground of waiver, but rather conclude that an attorney-client privilege attached under *Miller v. District Court,* 737 P.2d

matter differently than did the court of appeals but agree that the district court properly entered judgment terminating the parent-child legal relationship between B.B. and her child T.S.B.

## II.

A general outline of the statutory requirements and procedures leading up to a hearing on the termination of parental rights will be useful in understanding and resolving the narrow issue before us. A juvenile court[6] has exclusive original jurisdiction in proceedings concerning any child who is dependent or neglected. § 19–1–104(1)(c). A dependent or neglected child includes one who lacks proper parental care through the actions or omissions of a parent or whose parent fails or refuses to provide proper or necessary subsistence or other care necessary for the child's health, guidance or well-being. § 19–1–103(20)(b), (d). When a court receives a report that a child is dependent or neglected, it must order a preliminary investigation to determine whether the interests of the child or the community require further action to be taken. § 19–3–101(2). If the court determines from the results of the investigation that further action is required, it may authorize the filing of a petition alleging that the child is dependent or neglected. *Id.* The petition is brought by the People in the interest of the child, and the parent or parents allegedly neglecting the child are named as respondents. § 19–3–102. In order that the child be adjudicated a dependent or neglected child, facts necessary to establish dependency or neglect must be proved by a preponderance of the evidence. § 19–3–106(6)(a).

If the court finds the child to be dependent or neglected, it must hear evidence regarding what disposition would best serve the interests of the child and the public, § 19–3–109, and enter a decree of disposition, including such matters as legal custody and placement of the child, *id.* In connection with the decree of disposition, the court must approve an appropriate treatment plan "which is reasonably calculated to render the [parent] fit to provide adequate parenting to the child within a reasonable time and which is relative to the child's needs." § 19–3–111(1)(e)(II). *See People in Interest of M.M.,* 726 P.2d 1108, 1121 (Colo.1986). This statutory scheme furthers the legislative purposes of preserving and strengthening family ties whenever possible while still protecting the child's welfare. *See* § 19–1–102(1)(b), (c); *see also People in the Interest of A.M.D.,* 648 P.2d 625, 640 (Colo.1982) (primary purpose of dependency or neglect proceeding is to be "helpful and remedial in preserving and mending familial ties").

■ If the treatment plan is not successful, the best interests of the child may require that the parent-child legal relationship be terminated so that the child will become available for adoption. *See generally* § 19–4–107(1)(a).[7] A natural parent, however, has a fundamental liberty interest in the care, custody and management of his or her child. *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *A.M.D.,* 648 P.2d at 632; *see Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972). It is essential, therefore, that a state accord fundamentally fair procedures to a parent when the state seeks to terminate a parent-child legal relationship. *Santosky,* 455 U.S. at 753–54, 102 S.Ct. at 1394–95; *A.M.D.,* 648 P.2d at 632. In recognition of the seriousness of terminating parental rights, the general assembly adopted the Parent–Child Legal Relationship Termination Act of 1977, §§ 19–11–101

---

834 (Colo.1987), and that even if that privilege was not properly asserted, the admission of Dr. Kaplan's testimony was harmless error.

**6.** "Juvenile court" means "the juvenile court of the city and county of Denver or the juvenile division of the district court outside of the city and county of Denver." § 19–1–103(18), 8B C.R.S. (1986).

**7.** In appropriate circumstances, a court may combine the dispositional hearing with proceedings under the Parent–Child Legal Relationship Termination Act of 1977 and terminate the parent-child legal relationship as part of the decree of disposition. *See* § 19–3–111(2), (3).

to –110, 8B C.R.S. (1986), prescribing detailed procedures and criteria for termination proceedings.

In order to initiate proceedings to terminate a parent-child legal relationship, the People must file a written motion alleging the factual grounds for termination. § 19–11–103(1). The grounds that must be established before termination of parental rights can be ordered, as relevant to the present case, are set forth in section 19–11–105(1):

(1) The court may order a termination of the parent-child legal relationship upon the finding of ... the following:

. . . .

(b) That the child is adjudicated dependent or neglected and all of the following exist:

(I) That an appropriate treatment plan approved by the court has not been reasonably complied with by the parent or parents or has not been successful or that the court has previously found, pursuant to section 19–3–111(1)(e), that an appropriate treatment plan could not be devised;

(II) That the parent is unfit;

(III) That the conduct or condition of the parent or parents is unlikely to change within a reasonable time.

*Id.* The statute goes on to prescribe particular factors to be considered in determining whether a parent is unfit and whether the conduct or condition of the parent is unlikely to change within a reasonable time. The statute provides that in considering such factors "the court shall give primary consideration to the physical, mental, and emotional conditions and needs of the child" and if necessary shall order and review "an evaluation of the child's physical, mental, and emotional conditions." § 19–11–105(3). *See generally People in Interest of L.L.,* 715 P.2d 334 (Colo.1986) (considering proof necessary to satisfy statutory criteria); *People in Interest of L.D.,* 671 P.2d 940 (Colo.1983) (same).

■ In dependency or neglect proceedings the People have the burden of establishing the criteria for dependency or neglect by a preponderance of the evidence.

§ 19–3–106(6)(a). This standard of proof is appropriate because the focus in such a proceeding is on identifying problems detrimental to the child's welfare and providing assistance in rectifying them so that the child may continue to reside in the parental home if possible. In termination of parental rights proceedings, however, the parent faces the prospect of a final and complete severance of his or her legal relationship with the child. Given this severe potential consequence, due process requires that the grounds for termination of parental rights be established by clear and convincing evidence. *Santosky v. Kramer; A.M.D.*

In parental rights termination proceedings, a parent has the right to counsel, § 19–11–103(2), and a guardian ad litem must be appointed to represent the child's best interests, § 19–11–103(3). The hearing is to be conducted before the court without a jury, § 19–11–103(4), and is not to be held less than thirty days after the motion for termination is filed, § 19–11–103(1). Section 19–11–107(1), the statute at issue in this case, is part of the complex statutory scheme designed to accord fundamental fairness to all parties in parental rights termination proceedings. Set against this background of procedures and purposes, we must determine whether section 19–11–107(1) contemplates that an indigent parent may invoke a privilege and prevent the testimony of an expert witness appointed at the parent's request.

### III.

Section 19–11–107(1) provides:

An indigent parent has the right to have appointed one expert witness of his own choosing whose reasonable fees and expenses, subject to the court's review and approval, shall be paid by the state of Colorado pursuant to section 19–11–110.

*Id.*

■ We rely upon familiar principles to provide guidance in construing the statute. Our primary task is to determine and give effect to the intent of the general assembly. *Kern v. Gebhardt,* 746 P.2d

1340, 1344 (Colo.1987). To discern legislative intent, we look first and foremost to the language of the statute. *Id.* If the statutory language is ambiguous or unclear, we must analyze the statute with full regard for the policy and purpose manifested in the statutory scheme. *People v. Green,* 734 P.2d 616, 621 (Colo.1987). If at all feasible, the statute should be construed to make it effective in accomplishing the purposes for which it was enacted. *Schubert v. People,* 698 P.2d 788, 793 (Colo. 1985).

■ Section 19–11–107(1) does not expressly create a privilege or prohibit the People from calling an expert witness appointed at a parent's request when the parent objects. The language of the statute alone offers no answer to the question whether an indigent parent may claim a privilege to prevent an expert appointed under section 19–11–107(1) from testifying as to information learned as a result of such appointment. Viewed in the context of the statutory purposes, however, the meaning emerges with sufficient clarity. One purpose of the Parent–Child Legal Relationship Termination Act of 1977 was to provide fundamentally fair procedures in parental rights termination proceedings. *Cf. Santosky,* 455 U.S. at 753–54, 102 S.Ct. at 1394–95 ("[w]hen the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures"). These procedures necessarily must take into account a parent's fundamental interest in the care, custody and management of his or her child. *Santosky, Stanley, A.M.D.*

It is to be expected that the People will offer expert testimony to satisfy the statutory criteria for termination of parental rights. *See, e.g., Santosky,* 455 U.S. at 769, 102 S.Ct. at 1403 ("termination proceedings often require the factfinder to evaluate medical and psychiatric testimony"); *M.M.,* 726 P.2d at 1112–13 (court requested psychiatric evaluation of mother to determine parental capacity; psychiatrist testified at termination hearing); *L.L.,*

715 P.2d at 337 (two licensed psychologists conducted independent evaluations of mother and both recommended termination of parental rights); *L.D.,* 671 P.2d at 943–44 (psychiatrist and psychologist testified at termination hearing concerning evaluations of two children and their parents).

An indigent parent facing termination of his or her parental rights is disadvantaged by the inability to hire expert assistance to counter the People's evidence. It is apparent that section 19–11–107(1) was enacted in an effort to rectify this imbalance. The statute entitles an indigent parent facing the severe consequence of termination of the legal relationship with his or her child to obtain the assistance of an expert of the parent's own choosing. This accords an important measure of fairness to an indigent parent who otherwise might be unable to evaluate the People's case or to prepare his or her own.

It remains to be determined whether the People can elicit testimony from an expert appointed for an indigent parent under section 19–11–107(1) over the objection of the parent. We conclude that when an expert is appointed under section 19–11–107(1) for an indigent parent at the request of the parent's attorney, communications between the parent and the expert are protected by the attorney-client privilege.

An indigent parent has a statutory right to counsel in a proceeding for termination of parental rights. § 19–1–106(1)(d). If an attorney is to render effective assistance in such a proceeding the attorney must have access to expert advice and assistance with respect to evaluation of the fitness of the parent, including the parent's mental and emotional condition and ability to make such behavioral changes as will enable him or her to provide effectively for the needs of the child. *See* § 19–11–105(1). Appointment of an expert at the request of the parent under section 19–11–107(1) offers a means of obtaining such expert assistance.

Section 13–90–107(1)(b), 6A C.R.S. (1987), prohibits an attorney or legal assistant from being examined without the consent

of the client as to any communications made by the client to the attorney in the course of professional employment.[8]  In *Miller v. District Court*, 737 P.2d 834 (Colo.1987), which involved a criminal prosecution, we held that a defendant's disclosures to a defense-retained psychiatrist were protected by the attorney-client privilege and that, in the absence of a waiver of the privilege, the psychiatrist could not be called as a witness for the prosecution at a trial or hearing.  Our holding proceeded from the principle that the attorney-client privilege protects not only confidential communications between the client and the attorney but also confidential communications between the client and the attorney's agent retained for the purpose of litigation. We stated in *Miller:*

> The attorney-client privilege extends to confidential communications by or to the client in the course of gaining counsel, advice, or direction with respect to the client's rights or obligations.  Although section 13–90–107(1)(b) does not by its terms protect disclosures to a defense-retained psychiatrist, we have held that the privilege may be applied to communications between the client and agents of his attorney.  The agency rule recognizes that the complexities of practice prevent attorneys from effectively handling clients' affairs without the help of others.  The assistance of these agents "being indispensable to [the attorney's] work ..., the privilege must include all persons who act as the attorney's agents."  8 J. Wigmore, *Wigmore on Evidence* § 2301, at 583 (1961).  It is now settled that a psychiatrist retained by defense counsel to assist in the preparation of the defense is an agent of defense counsel for purposes of the attorney-client privilege.

*Id.* at 837–38 (citations and footnotes omitted).

The reasoning of *Miller* applies as well to parental rights termination proceedings. Were the attorney-client privilege not applicable to the present case, an indigent parent would be presented with a dilemma. The parent either could forego the assistance of an expert, with a resulting impairment of the parent's ability to evaluate and counter the People's evidence,. or could obtain appointment of an expert, and run the risk that the expert would obtain information and form opinions adverse to the parent's interest and that the People could then elicit the expert's testimony to support their own case.  To put the parent to such a choice would defeat the very purpose of section 19–11–107(1)—to enable an indigent parent to obtain assistance from an expert of the parent's own choosing at state expense in preparing a defense against the People's efforts to terminate the parent-child relationship.

## IV.

■ B.B. did not assert an attorney-client privilege but instead specifically claimed the psychologist-client privilege.[9] We conclude that such a privilege did not arise between B.B. and Doctor Kaplan, the clinical psychologist appointed by the court pursuant to section 19–11–107(1).

■ The psychologist-client privilege is delineated by section 13–90–107(1)(g), 6A C.R.S. (1987), which provides in pertinent part:

> A licensed psychologist shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment;

**8.** § 13–90–107(1)(b) provides:
 An attorney shall not be examined without the consent of his client as to any communication made by the client to him or his advice given thereon in the course of professional employment; nor shall an attorney's secretary, paralegal, legal assistant, stenographer, or clerk be examined without the consent of his employer concerning any fact, the knowl-

edge of which he has acquired in such capacity.

**9.** B.B.'s counsel specifically referred to the physician-patient privilege under § 13–90–107(1)(d), but the expression of intent was adequate to constitute an effective claim of the psychologist-client privilege under § 13–90–107(1)(g).

*Id.*[10] We have held that the purpose of the psychologist-client privilege is identical to that of the physician-patient privilege—to enhance the effective diagnosis and treatment of illness by protecting the patient from embarrassment that might be caused by disclosure of information given to the psychologist during a course of consultation for purposes of psychological treatment. *People v. District Court,* 719 P.2d 722, 724 (Colo.1986); *Clark v. District Court,* 668 P.2d 3, 8 (Colo.1983). The physician-patient privilege extends to information the patient discloses to the physician that is necessary for the physician to prescribe or act for the patient but not to information disclosed to the physician for some other purpose, such as preparation for pending litigation. *See People v. Marquez,* 692 P.2d 1089, 1094–95 (Colo.1984); *People v. Reynolds,* 195 Colo. 386, 388, 578 P.2d 647, 649 (1978); *Hanlon v. Woodhouse,* 113 Colo. 504, 509–10, 160 P.2d 998, 1001 (1945). In this case, Doctor Kaplan was appointed under section 19–11–107(1) for the purpose of assisting B.B. in her defense to the People's petition to terminate her parental rights. Any information obtained by Doctor Kaplan was not for purposes of diagnosing or treating B.B. but rather to assist B.B. in pending litigation, and thus was not within the psychologist-client privilege.

## V.

The question then arises whether by invoking the psychologist-client privilege, which did not exist, B.B. effectively claimed the attorney-client privilege, which was available. At the time B.B. asserted the privilege, as now, the attorney-client privilege was not clearly specified by statute to be applicable in the circumstances of this case. Nor had we clarified its applicability by caselaw. *Miller* was not decided until after the completion of the parental rights termination hearing, and until our decision today we had not specifically held the attorney-client privilege applicable under the present facts. Under these circumstances, the interest of justice might require that we consider the attorney-client privilege to have been properly invoked when B.B. asserted the psychologist-client privilege. After all, B.B.'s general purpose was clear—to assert that information obtained by the appointed psychologist in the course of assisting B.B. with trial preparations was cloaked with confidentiality.[11] We need not resolve this issue definitively, however, for we conclude that even if the admission of Dr. Kaplan's testimony was erroneous, the error was harmless.[12]

## VI.

■ In addition to Dr. Peter Kaplan, the People called several other witnesses to testify at the parental rights termination hearing. They included Dr. Frank Andrews, a licensed clinical psychologist who had examined B.B.; the social worker assigned to T.B. and T.S.B.'s cases; a licensed psychiatric nurse-therapist who had worked with B.B. and her children and was still counseling B.B. at the time of the hearing; and the instructor of the parental skills classes prescribed for B.B. and M.D.R. as part of their treatment plans.

The People's witnesses based their views of B.B.'s parental abilities on first-hand

10. § 12–43–120, 5 C.R.S. (1985), also provides for the confidentiality of communications between a psychologist and a client. It provides in pertinent part:

A psychologist shall not disclose, without the consent of his client, any confidential communications made by the client to him, or his advice given thereon, in the course of professional employment.

B.B. also claimed a privilege under this statute. For the purpose of this opinion it is unnecessary to decide whether § 12–43–120 provides an independent source for a claim of testimonial privilege or how it relates to § 13–90–107(1)(g).

11. It may be that not all the relevant information to which Dr. Kaplan testified was within the scope of the privilege. He had obtained information for the purpose of a "disability evaluation" under a contract with the department before he was appointed as an expert witness for B.B. *See generally Miller,* 737 P.2d at 840–41. We need not address this issue in detail because we conclude that even if Dr. Kaplan's testimony was improperly admitted, the error was harmless. See part VI of this opinion.

12. For this same reason, we need not determine whether § 19–11–107(1) contemplates a privilege broader than the attorney-client privilege applicable under *Miller.*

observation. In addition, Dr. Andrews testified that his opinion was based on evaluations of B.B. performed at the department's request prior to the initiation of dependency or neglect proceedings. The evaluations included testing, interviews and observation of B.B. with her children. The uncontradicted testimony of these witnesses, without exception, supports the trial court's decision to terminate B.B.'s parental rights. In light of the accumulation of evidence supporting that decision, we conclude that the admission of Dr. Kaplan's testimony, even if erroneous, amounted to harmless error.

## VII.

The admission of the testimony of Dr. Kaplan, even if erroneous, was harmless, and the court of appeals correctly affirmed the trial court's judgment terminating the parent-child legal relationship between B.B. and her child T.S.B. We affirm the judgment of the Colorado Court of Appeals.