1
 2025 CO 23 In Re Lucas Trenshaw and Theresa Gardner, as Personal Representative for the Estate of Timothy Trenshaw, Plaintiffs v. Eugene Jennings and All State Enterprise, Inc. Defendants No. 24SA262
Supreme Court of Colorado, En Banc
May 12, 2025
 
          
 Original Proceeding Pursuant to C.A.R. 21 Custer County
 District Court Case No. 22CV30013 Honorable Lynette Mary
 Wenner, Judge
 
 
          
 Attorneys for Plaintiffs: Bachus & Schanker, LLC J. Kyle
 Bachus Denver, Colorado
 
 
          
 Attorneys for Defendant Eugene Jennings: Gordon Rees Scully
 Mansukhani LLP John R. Mann Andrew K. Lavin Andres M.
 Hermosillo Denver, Colorado
 
 2
 
           Womble
 Bond Dickinson (US) LLP Kendra N. Beckwith Nathan B. Thoreson
 Denver, Colorado
 
 
          
 Attorneys for Respondent Custer County District Court: Philip
 J. Weiser, Attorney General Peter G. Baumann, Assistant
 Solicitor General Denver, Colorado
 
 
           No
 appearance on behalf of: All State Enterprise, Inc.
 
 
          
 JUSTICE SAMOUR delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE GABRIEL, JUSTICE HART, and JUSTICE BERKENKOTTER
 joined.
 
 3
 
          Order
 Made Absolute
 
 
          
 OPINION
 
 
           SAMOUR
 JUSTICE
 
 
          ¶1
 "What I may see or hear in the course of the treatment .
 . . in regard to the life of men, which on no account one
 must spread abroad, I will keep to myself[,] holding such
 things shameful to be spoken about." Ludwig Edelstein,
 The Hippocratic Oath: Text, Translation and
 Interpretation, in 1 Supplements to the
 Bulletin of the History of Medicine (Henry E. Sigerist ed.,
 Johns Hopkins Press 1943) (providing a translation from the
 Greek). This excerpt from the ancient version of the
 Hippocratic Oath highlights the importance of the special
 relationship between physicians and their patients. In re
 Vioxx Prods. Liab. Litig., 230 F.R.D. 473, 476 (E.D. La.
 2005). The physician-patient relationship has historically
 been one of the most sacrosanct and protected relationships
 throughout the globe. Id. Today, upon graduation,
 most medical students in the United States take a
 contemporary version of the Hippocratic Oath, declaring that
 they "will respect the privacy of [their] patients, for
 their [patients'] problems are not disclosed to [them]
 that the world may know." Id. at 476 n.8.
 
 
          ¶2
 The principles underlying the Hippocratic Oath were
 introduced into this country in the 1800s through a code of
 ethics, but they are now largely incorporated into state law.
 Id. at 476-77. In Colorado, our General Assembly has
 recognized that "[t]here are particular relations in
 which it is the policy of the law to encourage confidence and
 to preserve it inviolate." § 13-90-107(1), C.R.S.
 (2024).
 
 4
 
 The physician-patient relationship is one of those. §
 13-90-107(1)(d). Therefore, "[a] physician . . . shall
 not be examined without the consent of his or her patient as
 to any information acquired in attending the patient that was
 necessary to enable him or her to prescribe or act for the
 patient." Id. Such information is protected by
 what we now call the physician-patient privilege.
 
 
          ¶3
 The physician-patient privilege applies as forcefully to
 pretrial discovery as it does to in-court testimony. See
 Cardenas v. Jerath, 180 P.3d 415, 424 (Colo. 2008).
 Thus, the privilege protects certain information even if it
 would otherwise be discoverable as relevant to the subject
 matter of the litigation. Id.
 
 
          ¶4
 In this original proceeding, we must determine whether
 medical records generated during Eugene Jennings's visit
 to a hospital's emergency department, following a motor
 vehicle collision during which he was injured, are protected
 under the physician-patient privilege. The district court
 reviewed a screenshot of a portion of those records in
 camera. It then undertook a sentence-by-sentence analysis of
 five particular sentences to determine whether the
 information in each sentence was privileged. Despite finding
 that Jennings provided the information in question to his
 emergency department physician while describing how he
 sustained the injuries for which he was being treated, the
 court concluded that the information was not protected by the
 physician-patient privilege. Specifically, the court ruled
 that the information provided by Jennings about how the
 collision
 
 5
 
 occurred was not "necessary for the medical team to act
 or prescribe on" his behalf and thus fell outside the
 scope of the privilege.
 
 
          ¶5
 We now make absolute the order we issued to show cause. We
 hold that when, as here, medical records contain information
 provided by a patient to a physician during the course of
 receiving treatment for an injury, the records are protected
 by the physician-patient privilege. Such documents fall
 within the purview of section 13-90-107(1)(d) because they
 contain information "that was necessary to enable [a
 treating physician] to prescribe or act for the
 patient." § 13-90-107(1)(d).
 
 
          ¶6
 We recognize that the information shared by a patient with a
 treating physician may include facts about the underlying
 incident that led to the injury sustained. Indeed, in
 describing how he was injured to his emergency department
 physician, Jennings provided details about the collision. Of
 course, Jennings could not immunize from disclosure relevant
 facts about the collision by simply disclosing them to his
 emergency department physician or anyone else with whom he
 may have had a confidential relationship. Those facts are
 discoverable, including through interrogatories, requests for
 admission, and at a deposition. But the medical records
 themselves are privileged because they contain Jennings's
 communications with his emergency department
 physician about how he sustained
 
 6
 
 his injuries, and those communications were pertinent to the
 treatment provided by the physician.
 
 
          ¶7
 As such, the district court should not have reviewed (even in
 camera) the screenshot of a portion of Jennings's medical
 records, much less conducted a sentence-by-sentence analysis
 of a handful of sentences to determine whether the
 information in each sentence was necessary for Jennings's
 emergency department physician to prescribe or act on his
 behalf. A standard that would only protect information in
 medical records that a court, in hindsight, concludes was
 necessary for a physician to have acted or prescribed on
 behalf of a patient flies in the face of our jurisprudence
 and is, in any event, infeasible.
 
 
          I.
 Facts and Procedural History
 
 
          ¶8
 Late one afternoon, Jennings was driving a tractor-trailer
 truck for his employer, All State Enterprise, Inc. ("All
 State"), in Custer County. As he negotiated a curve on
 Highway 69, his truck flipped over and crushed the vehicle in
 the oncoming lane driven by Timothy Trenshaw, killing him
 instantly. Paramedics and Colorado State Patrol
 ("CSP") troopers contacted Jennings at the scene of
 the collision. He did not exhibit signs of intoxication, but
 the troopers nevertheless detained him for investigation.
 Because Jennings reported that he was injured, the troopers
 eventually transported him to Parkview Hospital.
 
 7
 
          ¶9
 During the course of receiving medical treatment from an
 emergency department physician at the hospital, Jennings
 discussed how he was injured. As he did so, he made
 statements describing how the collision occurred. The
 emergency department physician documented these statements.
 
 
          ¶10
 Thereafter, CSP allegedly collected some of Jennings's
 medical records from the hospital without Jennings's
 knowledge or consent and without a warrant. A trooper then
 transported Jennings to a Colorado Bureau of Investigations
 office before releasing him in a convenience store parking
 lot. The same trooper subsequently took all the records and
 reports related to the incident (including the medical
 records collected from the hospital), scanned them, and sent
 them to Master Trooper David Conway.
 
 
          ¶11
 Approximately one month later, Master Trooper Conway applied
 for a search warrant to obtain a complete copy of
 Jennings's medical records from Parkview Hospital.
 Although Master Trooper Conway had stated in his report that
 Jennings didn't show any signs of impairment, he attested
 in the affidavit in support of the search warrant that he was
 trying to verify the presence or absence of narcotic
 analgesics in Jennings's system. The district court
 approved the search warrant and required the production of
 all of Jennings's medical records from his visit to
 Parkview Hospital (not just those related to alcohol and drug
 testing). Parkview Hospital, in turn, produced all the
 requested records to CSP.
 
 8
 
          ¶12
 The district attorney's office for the Eleventh Judicial
 District ("district attorney's office")
 ultimately charged Jennings with one count of vehicular
 homicide and two counts of careless driving resulting in
 injury. Further, Trenshaw's sister (in her capacity as
 personal representative of Trenshaw's estate) and
 Trenshaw's son (collectively, "Plaintiffs")
 sued Jennings and All State in this wrongful death action.
 After this case was filed, Plaintiffs served Jennings with
 written discovery requests inquiring how the collision
 occurred and requesting any statements Jennings and all other
 witnesses had made about the collision. Thereafter, Jennings
 served a request on the district attorney's office,
 pursuant to Colorado's Open Records Act and
 Colorado's Criminal Justice Records Act, seeking all
 communications between that office and Plaintiffs'
 counsel. According to Jennings, the district attorney's
 office responded by producing, among other things, the
 medical records from his visit to Parkview Hospital. Two
 business days later, Jennings notified Plaintiffs and the
 district attorney's office that he had "never waived
 his privilege to the medical records." He expressed
 concern that his medical records had been improperly acquired
 and disseminated, and he requested that those records not be
 further disclosed.
 
 
          ¶13
 Because the district attorney's office's response
 indicated that the physician-patient privilege does not apply
 to district attorneys and that it was thus free to share the
 medical records with "other lawyers involved in
 litigating this
 
 9
 
 matter," and because he viewed Plaintiffs' response
 as ambiguous, Jennings filed a motion for a protective order.
 The district court, which is presiding over both this case
 and the criminal case, granted the motion.
 
 
          ¶14
 First, the court found that Plaintiffs had failed to show the
 relevance of the medical records. More specifically, it noted
 that there did not appear to be a basis for alleging that
 Jennings was impaired by drugs or alcohol at the time of the
 collision. Second, the court concluded that the authority
 cited by Jennings supported his position that "the
 medical records are privileged" under section
 13-90-107(1)(d) and that "the privilege is not overborne
 by the fact that the records were disclosed" without his
 permission to the district attorney's office. And third,
 the court noted that no authority supported Plaintiffs'
 contention that an "order for a warrant entitle[d] a
 third party (i.e.[,] Plaintiff[s]) to receive the fruits of
 the search." Given that Jennings had not waived his
 physician-patient privilege, the court (1) prohibited
 Plaintiffs from possessing Jennings's "medical
 records or any reports that rely upon them," (2) ordered
 Plaintiffs to destroy any copies of Jennings's medical
 records in their possession, and (3) precluded Plaintiffs
 from engaging in further efforts to obtain those records.
 
 
          ¶15
 Thereafter, Plaintiffs obtained from the district
 attorney's office a police report containing a screenshot
 of a portion of the medical records: the emergency department
 physician's notes summarizing Jennings's past
 "medical history" and
 
 10
 
 "present symptoms," which included Jennings's
 description of how the collision occurred. Jennings sought
 the district court's intervention again, arguing that
 this constituted a violation of the protective order.
 Plaintiffs disagreed, countering that the police report was
 publicly available.
 
 
          ¶16
 During a hearing closed to the public, Plaintiffs maintained
 that five sentences in the emergency department
 physician's notes summarizing Jennings's description
 of the collision (the "five sentences") were not
 privileged. According to Plaintiffs, the five sentences
 documented statements made by Jennings that were "not
 medically relevant" because, in their view, those
 sentences were "not necessary to enable the
 [hospital's] medical practitioner to prescribe or
 act" for him. Plaintiffs asked the court to rule that
 they could make use of the five sentences in this litigation.
 Jennings, for his part, insisted that his medical
 records-including the portion reflected in the screenshot
 within the police report-were privileged regardless of
 whether they contained statements about how the collision
 occurred.
 
 
          ¶17
 A few weeks after the hearing, the court received from
 Plaintiffs the police report containing the screenshot of a
 portion of Jennings's medical records. The court then
 performed an in camera review. Pursuant to Plaintiffs'
 request, the court focused on the five sentences. It
 undertook a sentence-by-sentence analysis to determine
 whether the information in each sentence was required to
 permit the
 
 11
 
 emergency department physician to prescribe or act on
 Jennings's behalf. The court determined that, while the
 five sentences reflected statements uttered by Jennings about
 the "injuries resulting from the accident," they
 described how the collision occurred and were thus "not
 necessary for the medical team to act or prescribe on [his]
 behalf." Accordingly, the court (1) ruled that Jennings
 had failed to make "an adequate showing" that these
 statements were protected by the physician-patient privilege,
 (2) dissolved the protective order, and (3) required Jennings
 to disclose "the portion[] of the medical records
 containing only the [five] statements."
 
 
          ¶18
 Jennings then invoked our original jurisdiction through a
 C.A.R. 21 petition, arguing that the medical records
 generated by Parkview Hospital are privileged and the
 district court thus shouldn't have reviewed (even in
 camera) the screenshot of a portion of those
 records.[1] We issued an order to show cause.
 
 12
 
          II.
 Original Jurisdiction
 
 
          ¶19
 We have sole discretion to exercise our original jurisdiction
 pursuant to C.A.R. 21. Rademacher v. Greschler, 2020
 CO 4, ¶ 20, 455 P.3d 769, 772. Relief under C.A.R. 21 is
 extraordinary and is limited both in purpose and
 availability. Id.
 
 
          ¶20
 Discovery orders are generally interlocutory in nature and
 thus reviewable only on direct appeal following entry of a
 final judgment. Jordan v. Terumo BCT, Inc., 2024 CO
 38, ¶ 23, 550 P.3d 628, 633. Consequently, we "will
 not ordinarily" exercise our original jurisdiction to
 "review a trial court's pretrial discovery
 order." Ortega v. Colo. Permanente Grp., P.C.,
 265 P.3d 444, 447 (Colo. 2011). However, we have previously
 exercised our discretion under C.A.R. 21 to review a trial
 court's discovery order in circumstances in which no
 other appellate remedy is adequate because, absent our
 intervention, a party may suffer irreparable harm.
 Id. "When a trial court's order involves
 records which a party claims are protected by a statutory
 privilege, . . . an immediate review is appropriate because
 the damage that could result from disclosure would occur
 regardless of the ultimate outcome of an appeal from a final
 judgment." Id.
 
 
          ¶21
 The exercise of our original jurisdiction under C.A.R. 21 is
 warranted in this case given "the nature of the rights
 implicated and the potential irreparable harm from disclosure
 of medical information." Id. Were we to deny
 Jennings's C.A.R. 21 petition, it would render his
 privilege claim effectively moot because the
 
 13
 
 order under challenge grants Plaintiffs access to some of the
 contents of his medical records. And, as the saying goes,
 once the cat's out of the bag, it can't be put back
 in.
 
 
          ¶22
 Having explained why we granted Jennings's C.A.R. 21
 petition, we move on to address the merits of the
 parties' contentions. In the process, we explain why we
 make absolute the order we issued to show cause.
 
 
          III.
 Analysis
 
 
          ¶23
 We begin by setting forth the standard of review that guides
 our analysis. We then discuss the legal principles
 undergirding the physician-patient privilege in Colorado.
 Next, we consider Jennings's claim and conclude that the
 medical records in question (including the portion reflected
 in the screenshot within the police report) are protected by
 the physician-patient privilege. We end by rejecting the
 waiver contention advanced by Plaintiffs.
 
 
          A.
 Standard of Review
 
 
          ¶24
 We generally review a trial court's discovery order
 concerning privilege for an abuse of discretion.
 Jordan, ¶ 26, 550 P.3d at 633. However, in this
 case, we deal with the interpretation of a statute, which
 presents a legal question subject to de novo review.
 Miller v. Amos, 2024 CO 11, ¶ 11, 543 P.3d 393,
 396. Because the physician-patient privilege is statutory, we
 review a trial court's application of the privilege de
 novo. See People v. Kailey, 2014 CO 50, ¶ 12,
 333 P.3d 89, 93 (making
 
 14
 
 this point in the context of the psychologist-patient
 privilege, which also resides in section 13-90-107). Hence,
 our review is de novo.
 
 
          B.
 The Physician-Patient Privilege in Colorado -Legal
 Principles
 
 
          ¶25
 Our General Assembly adopted the physician-patient privilege
 "to encourage a patient to make full disclosure to a
 doctor to enhance the effective diagnosis and treatment of
 illness." Hartmann v. Nordin, 147 P.3d 43, 53
 (Colo. 2006). The privilege aims to accomplish this goal
 "by protecting the patient from the embarrassment and
 humiliation that might be caused" through the disclosure
 of information obtained by the physician during the course of
 treatment. Clark v. Dist. Ct., 668 P.2d 3, 8 (Colo.
 1983). Through the physician-patient privilege, a patient is
 vested with the power to prevent the disclosure of such
 information. Weil v. Dillon Cos., 109 P.3d 127, 129
 (Colo. 2005). As we stated in Alcon v. Spicer, 113
 P.3d 735, 738 (Colo. 2005), the privilege may be viewed
 "as recognizing the inherent importance of privacy in
 the physician[-]patient relationship by protecting the
 confidences once made." Interfering with the
 physician-patient relationship would not only be unfair to
 the patient, who has provided information in confidence, it
 could also adversely affect the quality of medical care
 available. In re Vioxx Prods. Liab. Litig., 230
 F.R.D. at 477.
 
 
          ¶26
 The privilege isn't limited to communications with a
 physician during an examination conducted for purposes of
 treatment; it also includes observations
 
 15
 
 made by a physician during such an examination. People v.
 Covington, 19 P.3d 15, 19 (Colo. 2001). Further, the
 protection provided by the privilege extends beyond
 "in-court testimony" and sweeps in the
 "pretrial discovery of information." Hoffman v.
 Brookfield Republic, Inc., 87 P.3d 858, 861 (Colo.
 2004). This includes discovery of privileged information
 contained in medical records. See Clark, 668 P.2d at
 11.
 
 
          ¶27
 The burden of establishing the applicability of a privilege
 rests with the party asserting it. Hartmann, 147
 P.3d at 49. Once the physician-patient privilege attaches,
 "the only basis for authorizing a disclosure of the
 confidential information is an express or implied
 waiver." Clark, 668 P.2d at 9. Any
 party seeking to overcome the privilege bears the burden of
 establishing a waiver. Id. at 8. For an express
 waiver to occur, the privilege holder must explicitly waive
 the privilege. But when the privilege holder injects a
 "physical or mental condition into the case as the basis
 of a claim or an affirmative defense," an implied waiver
 occurs. Id. at 10.
 
 
          ¶28
 In determining whether the privilege has been impliedly
 waived, "the proper inquiry is not whether the
 information sought may be relevant." People v.
 Sisneros, 55 P.3d 797, 801 (Colo. 2002). After all, the
 physician-patient privilege may protect information even when
 the information is relevant to the subject matter of the
 case. Cardenas, 180 P.3d at 424. It follows that
 "relevance alone
 
 16
 
 cannot be the test" for implied waiver. Johnson v.
 Trujillo, 977 P.2d 152, 157 (Colo. 1999) (quoting
 R.K. v. Ramirez, 887 S.W.2d 836, 842 (Tex. 1994)).
 To apply implied waiver to any information that's
 relevant would be to allow the exception to swallow the
 privilege. Alcon, 113 P.3d at 741. But because the
 privilege withholds potentially relevant information, we
 construe it narrowly. Hartmann, 147 P.3d at 49.
 
 
          ¶29
 The physician-patient privilege is personal to the patient
 (or the patient's estate) and may not be invoked by the
 physician or a third party. See Gadeco, LLC v.
 Grynberg, 2018 CO 22, ¶ 10, 415 P.3d 323, 328;
 People v. Palomo, 31 P.3d 879, 885 (Colo. 2001). Nor
 may it be waived by the physician or a third party. See
 Samms v. Dist. Ct., 908 P.2d 520, 524 (Colo. 1995).
 
 
          ¶30
 We have explained that not all information acquired by a
 physician from a patient is safeguarded from disclosure.
 Covington, 19 P.3d at 19. By the very terms of the
 privilege statute, such information is protected only when it
 is necessary for the physician to "prescribe or act for
 the patient." § 13-90-107(1)(d). Thus, for example,
 a physician's record containing only the name, address,
 and phone number of a patient falls outside the scope of the
 privilege because those are matters unnecessary for the
 physician to prescribe or act for the patient. Wolf v.
 People, 187 P.2d 926, 927 (Colo. 1947). The same holds
 true with respect to information obtained by a physician to
 assist a patient in pending litigation, see
 
 17
 
 B.B. v. People, 785 P.2d 132, 140 (Colo. 1990)
 (involving the psychologist-patient privilege, which we have
 equated to the physician-patient privilege), and a
 physician's testimony in a criminal case premised on a
 blood sample procured at the request of a police officer
 investigating the defendant's level of intoxication,
 see Hanlon v. Woodhouse, 160 P.2d 998, 1001 (Colo.
 1945).
 
 
          ¶31
 In contrast to Wolf, B.B., and
 Hanlon, we landed on the other side of the privilege
 ledger in Covington. There, a physician assistant
 took photographs of Mrs. Covington's gunshot wounds while
 providing her treatment in a hospital's emergency room
 shortly after her husband shot her with a rifle.
 Covington, 19 P.3d at 18. The physician assistant
 took the pictures at the request of a sheriff's deputy.
 Id. Before her husband's criminal trial, Mrs.
 Covington invoked the physician-patient privilege with
 respect to the photographs, but the trial court ruled that
 they were not protected by the privilege because they were
 unnecessary for her treatment. Id. at 18-19.
 Accordingly, the court permitted the prosecution to call the
 physician assistant as a witness to provide foundation
 testimony to admit the photographs into evidence.
 Id. at 19.
 
 
          ¶32
 A division of the court of appeals reversed, ruling that the
 admission of the photographs constituted prejudicial error
 because they were protected by the physician-patient
 privilege. Id. Although we reversed on other
 grounds, we agreed with the division's determination
 regarding the application of the
 
 18
 
 physician-patient privilege.[2] Id. at 18. We sided with
 the defense's contention that, although the physician
 assistant had taken the photographs at the request of law
 enforcement, she'd used the information depicted in them
 to treat Mrs. Covington. Id. at 19-20. Because the
 information contained within the photographs memorialized the
 observations made by the physician assistant during her
 examination of Mrs. Covington, and because these were
 observations she could not have made but for her position as
 a treating professional, we concluded that the photographs
 fell within the physician-patient privilege. Id.
 
 
          C.
 Application
 
 
          ¶33
 Jennings argues that the district court erred in reviewing
 the screenshot of a portion of his medical records. Moreover,
 he asserts that it was improper for the court to undertake a
 sentence-by-sentence analysis of the five sentences to
 determine whether the information contained in each sentence
 was necessary for the emergency room department physician to
 prescribe or act on his behalf. Plaintiffs counter that the
 court correctly resolved the issues before it.
 
 
          ¶34
 In ruling for Plaintiffs, the district court relied almost
 exclusively on cases in which we have determined that the
 physician-patient privilege didn't apply
 
 19
 
 because the information acquired by the physician in treating
 the patient was not necessary to prescribe or act on the
 patient's behalf. While we stand by these cases today,
 they are distinguishable.
 
 
          ¶35
 This is not a case involving records in a physician's
 custody containing only a patient's identifying
 information (i.e., the patient's name, address, and phone
 number). See Wolf, 187 P.2d at 927.[3] Nor are we
 dealing with information provided by a patient for the
 purpose of receiving a physician's assistance in pending
 litigation, see B.B., 785 P.2d at 140, or with
 testimony regarding a blood sample obtained at the request of
 law enforcement for purposes of determining someone's
 level of intoxication, see Hanlon, 160 P.2d at 1001.
 Rather, it is undisputed that the medical records at issue
 here contain information acquired by an emergency department
 physician while treating Jennings for the injuries he
 sustained in the collision. As such, this case is more akin
 to Covington.
 
 
          ¶36
 Although the district court leaned on Covington,
 that case actually undermines its discovery order. The
 photographs in Covington found shelter in the
 physician-patient privilege both because their contents
 memorialized observations made by the physician assistant
 while treating Mrs. Covington for
 
 20
 
 gunshot wounds and because the physician assistant would not
 have been in a position to make those observations if she
 hadn't been a treating professional. Covington,
 19 P.3d at 20. So, too, here: The notes in the medical
 records reflect information provided by Jennings to his
 emergency department physician during treatment, and the
 physician would not have been in a position to receive that
 information if he hadn't been a treating professional.
 
 
          ¶37
 Plaintiffs contend, however, that the five sentences fall
 outside of the privilege's protective blanket because, in
 their view, Jennings's description of the collision was
 unnecessary to permit the emergency department physician to
 prescribe or act on his behalf. Therefore, urge Plaintiffs,
 we should approve the district court's approach of wading
 through the five sentences one by one to determine what
 information, if any, was protected by the physician-patient
 privilege. We decline Plaintiffs' invitation.
 
 
          ¶38
 We have never sanctioned a system in which a trial court must
 conduct a sentence-by-sentence analysis of medical records
 (or a statement-by-statement analysis of proffered testimony)
 to determine, in hindsight, whether the information contained
 in each sentence or statement was necessary for the treating
 physician to prescribe or act for the patient. None of the
 cases cited by the district court endorse this analytical
 framework.
 
 21
 
          ¶39
 Instead, after concluding in Wolf. B.B., and
 Hanlon that the physician-patient privilege was
 inapplicable because the information acquired by the
 physician was not necessary to prescribe or act on the
 patient's behalf, we simply deemed the documents or
 testimony under challenge wholly admissible. See
 Wolf, 187 P.2d at 927; B.B., 785 P.2d at 140;
 Hanlon, 160 P.2d at 1001. There was no
 sentence-by-sentence or statement-by-statement parsing.
 
 
          ¶40
 Cook v. People, 153 P. 214 (Colo. 1915), a
 110-year-old opinion cited by Plaintiffs, doesn't support
 their proposed piecemeal analysis. In that case, the
 defendant was taken to the hospital after suffering a gunshot
 wound on the night he allegedly murdered the victim.
 Id. at 215. At trial, he objected to his treating
 physician's testimony based on the physician-patient
 privilege. Id. The trial court overruled his
 objection and permitted the physician to testify.
 Id. We affirmed, but our treatment of the privilege
 issue was cursory. Id. at 215-16. After noting that
 the physician had simply testified about the defendant's
 refusal to consent to the removal of the bullet or to explain
 how he was shot, we concluded that this "was not
 necessary information to enable the doctor to prescribe or
 act for his patient." Id. at 216. We didn't
 engage in the type of statement-by-statement dissection for
 which Plaintiffs advocate.[4] Id.
 
 22
 
          ¶41
 Not only does Plaintiffs' suggested methodology lack
 support in our jurisprudence, it is unworkable. To begin, it
 would require trial court judges to regularly access
 privileged medical confidentialities for purposes of
 assessing what information, if any, was necessary for the
 physician to prescribe or act on the patient's behalf.
 Yet, we have made clear in the context of the attorney-client
 privilege that providing documents containing privileged
 information to a trial court judge for an in camera review is
 still a form of disclosure. See People v.
 Cortes-Gonzalez, 2022 CO 14, ¶ 56, 506 P.3d 835,
 847. Even if an in camera review of medical records were to
 result in no documents being disclosed to any party, there
 would still be "a chilling effect" on physicians
 and patients, especially where such reviews would occur
 routinely and would be easily obtained. Id., 506
 P.3d at 848 (quoting People v. Madera, 112 P.3d 688,
 691 (Colo. 2005)) (making this point with respect to
 attorneys and clients). Not surprisingly, C.R.C.P.
 26(b)(5)(A), which directs civil litigants on when and how to
 assert a privilege claim (including one rooted in section
 13-90-107(1)(d)), aims to reduce the need for in camera
 reviews. Alcon, 113 P.3d at 742.
 
 23
 
          ¶42
 Moreover, Plaintiffs' proposal would render the
 application of the physician-patient privilege unpredictable.
 Patients would have no way of knowing at the outset of
 medical treatment whether information shared with a treating
 physician would be protected. Consequently, patients who
 obviously lack the ability to diagnose and treat themselves
 would be forced to parse what information is
 "necessary" for the physician to prescribe or act
 for them. This would discourage, not encourage, patients'
 forthrightness with a treating physician and would frustrate
 the chief purpose of the physician-patient privilege.
 
 
          ¶43
 Lastly, the standard offered by Plaintiffs would require a
 trial court to substitute its judgment for that of a
 physician's. This would be problematic because a trial
 court lacks the medical expertise of a physician. How can a
 trial court be expected to determine-on a cold record and in
 hindsight-what information was necessary for the physician to
 prescribe or act for the patient? The alternative would be
 equally impractical: It would require physicians or other
 medical personnel to come to court in every case in which
 there is a dispute about the physician-patient privilege to
 identify what information acquired during treatment was
 necessary to prescribe or act for the patient.
 
 
          ¶44
 We now hold that where, as here, medical records contain
 information provided by a patient to a physician during the
 course of receiving treatment for
 
 24
 
 an injury, the records are protected by the physician-patient
 privilege. Hence, the district court erred in reviewing the
 screenshot of a portion of Jennings's medical
 records.[5]
 
 
          ¶45
 We recognize that the information shared by a patient with a
 treating physician may include details regarding how an
 injury occurred. Indeed, it is not unusual for a physician
 treating a patient who has suffered an injury to ask how the
 injury occurred, as such information may be of assistance in
 prescribing or acting for the patient. And we understand that
 the patient's response may include facts about the
 underlying incident that led to the injury.
 
 
          ¶46
 This reality causes Plaintiffs consternation. They maintain
 that extending the physician-patient privilege's
 protective mantle to Jennings's medical records allows
 him to conceal relevant facts about the case-specifically,
 his version of how the collision occurred. Not so. Although
 neither party cited it, our recent opinion in Jordan
 is instructive.
 
 
          ¶47
 There, plaintiffs retained an expert to opine about when and
 where they had been exposed to a carcinogen allegedly emitted
 by a plant operated by defendants.
 
 25
 
 Jordan, ¶ 1, 550 P.3d at 630. To assist the
 expert, plaintiffs' counsel put together a spreadsheet
 showing where each plaintiff had lived and worked during the
 pertinent timeframe. Id. After plaintiffs'
 counsel shared this spreadsheet with the expert, defendants
 sought access to any communications between plaintiffs and
 their counsel containing the information used to create the
 spreadsheet. Id. at ¶ 2, 550 P.3d at 630.
 Plaintiffs objected, arguing that the communications were
 protected by the attorney-client privilege and fell outside
 the scope of disclosures required by C.R.C.P. 26(a)(2).
 Jordan, ¶ 2, 550 P.3d at 630. The trial court
 granted defendants' request and ordered plaintiffs to
 produce "the raw facts or data reported by
 plaintiffs" to their counsel. Id. Plaintiffs
 then sought relief from our court pursuant to C.A.R. 21, and
 we issued a rule to show cause. Id. at ¶ 3, 550
 P.3d at 630.
 
 
          ¶48
 In making the rule absolute, we concluded that,
 "although the underlying facts" were "not
 privileged," the trial court had erred in determining
 "that the attorney[-]client privilege does not apply to
 protect a client's confidential communications
 of such facts to trial counsel." Id. at ¶
 4, 550 P.3d at 630 (emphasis added). We explained that
 clients routinely share factual information with their
 counsel, but that doesn't entitle opposing counsel to
 access the clients' communications containing
 such information. Id. Instead, we said, the proper
 method of obtaining those facts is through discovery directed
 at the clients. Id.
 
 26
 
 And we ruled that C.R.C.P. 26(a)(2) merely obligated
 plaintiffs to disclose the spreadsheet their counsel had
 provided to their expert, not the privileged and confidential
 communications counsel had used in preparing the
 spreadsheet-communications the expert had never seen.
 Jordan, ¶ 5, 550 P.3d at 631.
 
 
          ¶49
 It is likewise here. Jennings may not refuse to disclose
 relevant facts within his knowledge simply because he
 incorporated those facts into his communications with his
 emergency department physician. Otherwise, he could immunize
 from disclosure any relevant fact by disclosing it to a
 treating physician or anyone else with whom he may have a
 confidential relationship. Cf. 1 Geoffrey C. Hazard,
 Jr. &W. William Hodes, The Law of Lawyering: A
 Handbook on the Model Rules of Professional Conduct
 § 1.6:103, at 137 (2d ed. Supp. 1997) (stating, while
 discussing the attorney-client privilege, that "the fact
 that a client has discussed the facts with a lawyer does not
 protect the client from thereafter being asked about
 the facts"; otherwise, "a client could immunize
 herself against interrogation about the facts simply by
 telling them to her lawyer"), cited with approval in
 Gordon v. Boyles, 9 P.3d 1106, 1123 (Colo. 2000). Still,
 Plaintiffs may not learn about those facts by accessing
 Jennings's medical records because Jennings cannot be
 compelled to disclose his communications with his emergency
 department physician. Although the facts contained in the
 communications about how the
 
 27
 
 collision occurred are not privileged, the communications
 themselves are privileged. The proper method for
 Plaintiffs to learn about those facts is through discovery
 directed at Jennings.[6]
 
 
          ¶50
 But what about the screenshot of a portion of Jennings's
 medical records? Of course, the fact that this screenshot
 appears in a police report does not, by itself, entitle
 Plaintiffs to access it. The screenshot reflects privileged
 information contained in Jennings's medical records, and
 law enforcement allegedly accessed that information
 improperly. Under the circumstances of this case, it would
 make little sense to preclude Plaintiffs from obtaining
 access to Jennings's medical records but to then turn
 around and allow Plaintiffs to use the screenshot of a
 portion of those records within the police report. Jennings
 certainly should not suffer the consequences of law
 enforcement obtaining his privileged information without his
 consent.[7]
 
 28
 
          ¶51
 This leaves Plaintiffs' waiver contention, which we
 reject in short order. Plaintiffs argue that Jennings waived
 his physician-patient privilege because his attorney did not
 submit a privilege log in accordance with C.R.C.P. 26(b)(5).
 We are unpersuaded.
 
 
          ¶52
 Plaintiffs elevate form over substance. The record reflects
 that Jennings's counsel timely asserted the
 physician-patient privilege by email two business days after
 becoming aware that law enforcement had obtained
 Jennings's medical records and shared them with
 Plaintiffs' counsel. And Plaintiffs fail to identify any
 information that would have appeared in a privilege log that
 was not included in this email. Nor do Plaintiffs show that
 Jennings's counsel engaged in deception,
 misrepresentation, or some other form of misconduct. Thus,
 Plaintiffs suffered no prejudice, and Jennings gained no
 advantage. Besides, by the time counsel sent the email,
 Jennings's physician-patient privilege had already been
 breached, and time was of the essence. Accordingly, under the
 specific circumstances of this case, we decline to find a
 waiver of the physician-patient privilege as a sanction for
 counsel's failure to complete a privilege log.
 
 
          IV.
 Conclusion
 
 
          ¶53
 For the foregoing reasons, we make absolute the order to show
 cause. We remand the case for further proceedings consistent
 with this opinion.
 
 
 ---------
 
 
 Notes:
 
 
 [1] Jennings framed the issue as
 follows:
 
 
 1. Whether, where an emergency department visit was
 medically necessary, the district court erred in reviewing
 statements made to the emergency department physician and
 documented in the medical records by parsing
 sentence-by-sentence the information to consider whether it
 was "necessary to the physician to act on" and
 therefore protected under the statutory patient-physician
 privilege, rather than finding the entire medical record
 privileged.
 
 
 [2] We ultimately held that the physician
 assistant's testimony was admissible based on the statute
 then in effect requiring healthcare providers to report
 certain incidents to law enforcement, which we viewed as
 abrogating the physician-patient privilege in certain
 circumstances. Covington, 19 P.3d at 22-23.
 
 
 [3] The district court cited Belle
 Bonfils Memorial Blood Center v. District Court, 763
 P.2d 1003, 1009 (Colo. 1988), instead of Wolf. But,
 as relevant here, Belle Bonfils, which involved
 blood donors (not patients), merely repeated our holding in
 Wolf.
 
 
 [4] People v. Reynolds, 578 P.2d
 647 (Colo. 1978), a sexual assault case, is of the same ilk
 as Cook. We acknowledged there that, before ruling
 on the privilege claim raised by the prosecution on behalf of
 the victim, the trial court had to determine whether the
 information acquired by the physician during his examination
 was necessary to enable him to prescribe or act for the
 victim. Id. at 649. But we at no point suggested,
 let alone approved, a statement-by-statement analysis of the
 physician's proposed testimony. Id.
 
 
 [5] This is not to say that trial courts
 may never perform in camera reviews of medical records.
 C.R.C.P. 26(b)(5) expressly allows such reviews-but only
 after certain well-worn procedures have been followed and
 efforts to resolve any dispute over a privilege claim have
 been exhausted. See Alcon, 113 P.3d at 742. The
 district court did not adhere to C.R.C.P. 26(b)(5)
 here.
 
 
 [6] Jennings invoked his Fifth Amendment
 privilege against self-incrimination in response to certain
 written discovery requests and a deposition request. However,
 he has since pleaded guilty in his criminal case and is now
 awaiting sentencing later today. Accordingly, on remand,
 Plaintiffs may re-notice his deposition and re-serve any
 appropriate written discovery to inquire about Jennings's
 version of events.
 
 
 [7] Jennings also asks us to conclude that
 any information derived from an investigation conducted by
 law enforcement based on privileged information allegedly
 obtained improperly should be treated as fruit of the
 poisonous tree and thus suppressed. We do not reach this
 request because it hasn't been addressed by the district
 court yet.
 
 
 ---------